866 F.2d 1035
 Donald G. MADSEN, Appellant,
v.
DEPARTMENT OF AGRICULTURE; Richard Lyng, Secretary of
Department of Agriculture; United States Agriculture
Stabilization and Conservation Service, a division of the
United States Department of Agriculture; Thomas Vongarlem,
Deputy Administrator; Dale Anderson, State Executive
Director; Donely Wilson, District Director; Manford
Lomheim, County Executive Director; Jerry Hammerquist, Past
Chairman County Committee; Dean Talty, Chairman County
Committee; Gordon Babcock, Vice Chairman County Committee;
Ann Knudson, Program Assistant; Department of Justice and
Edwin Meese, Attorney General of the United States, Appellees.
 No. 87-5476.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 21, 1988.
Decided Jan. 30, 1989.
Rehearing and Rehearing En Banc Denied June 28, 1989.
 
 Donald G. Madsen, New Underwood, S.D., pro se.
 Robert A. Mandel, Rapid City, S.D., for appellees.
 Before ARNOLD, FAGG and WOLLMAN, Circuit Judges.
 FAGG, Circuit Judge.
 
 
 1
 Donald G. Madsen filed this suit against the United States Department of Agriculture, Secretary of Agriculture Richard Lyng, and various officials of the Agriculture Stabilization and Conservation Service (ASCS) for the purpose of contesting the bushels-per-acre wheat yield assigned to his South Dakota farm. The district court dismissed the case on the ground that it lacked jurisdiction to review the agency's decision, and Madsen appeals. For different reasons, we affirm.
 
 
 2
 The ASCS, operating through its local county committee, lowered the wheat yields assigned to Madsen's farm for the years from 1981 to 1985. Although Madsen disagreed with the accuracy of these revised yields, he chose not to pursue fully administrative procedures available for challenging them. Congress later passed legislation that incorporated some of these unchallenged yields into an averaging formula used in making crop yield calculations for 1986 and later years. See 7 U.S.C. Sec. 1466 (Supp. IV 1986).
 
 
 3
 Madsen seeks in this action to contest the underlying annual yields that factor into the 1986 average yield computation. In response to the government's motion to dismiss or for summary judgment, the district court concluded that agency regulations prevented judicial review of the agency's decision. The court thus dismissed Madsen's complaint for lack of jurisdiction.
 
 
 4
 Madsen's complaint and other filings demonstrate that his claims are based principally on the Administrative Procedure Act (the APA), 5 U.S.C. Secs. 701-706. While the district court referred to agency regulations for its decision that it lacked jurisdiction over Madsen's case, the government on appeal contends the APA precludes judicial review because Madsen's claims arise from "agency action [that] is committed to agency discretion by law," id. Sec. 701(a)(2). The legal source for this commitment of discretion, according to the government, is a statute limiting intra-agency review of factual determinations that form the basis of Madsen's wheat program payments. See 7 U.S.C. Sec. 1385 (Supp. IV 1986).
 
 
 5
 Section 1385, however, is not a complete bar to judicial review of agency action related to farm program payments. See, e.g., Westcott v. United States Dep't of Agric., 611 F.Supp. 351, 353 (D.Neb.1984), aff'd, 765 F.2d 121 (8th Cir.1985) (per curiam). Although factual determinations of an agency are not subject to judicial review under section 1385, we are free under the APA to review legal questions or agency action asserted to be arbitrary or capricious. Id.; Robinson v. Block, 608 F.Supp. 817, 820 (W.D.Mich.1985) (section 1385 does not bar inquiry into agency performance of statutory and regulatory duties); see also Garvey v. Freeman, 397 F.2d 600, 604-05 (10th Cir.1968) (section 1385 does not bar judicial review of farmer's challenge, on due process grounds, of assigned wheat yield).
 
 
 6
 Similarly, regulations covering appeals of agency determinations in specified farm programs, see 7 C.F.R. Secs. 780.1--780.12 (1988), do not preclude all judicial review of farm program payment decisions. Instead, these regulations limit the extent of review available within the administrative agency. See id. Secs. 780.3--780.5; see also Garvey, 397 F.2d at 604. Having reviewed the nature of Madsen's claims, we conclude neither section 1385 nor the regulations governing agency appeals prevents review of those claims under the APA.
 
 
 7
 Beyond this, the APA exception to judicial review for action committed by law to agency discretion is a "very narrow" one, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), and the exception applies only when statutes are so broadly drawn that there is " 'no law to apply,' " id. (quoted citation omitted). A statute fits into this category when it "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Because Congress has directed that crop yields be calculated according to a specific statutory formula and because the agency has adopted regulations describing the procedure for this calculation, there is "law to apply." We thus conclude Madsen's claims are properly subject to judicial review under the APA, and the district court had jurisdiction over Madsen's case.
 
 
 8
 On appeal, the government argues the district court nevertheless properly dismissed Madsen's complaint because he failed to exhaust available administrative remedies. In this regard, we believe the government's argument is well taken.
 
 
 9
 Madsen elected not to take full advantage of administrative procedures permitting him to challenge wheat yields assigned to his farm for the 1981-85 crop years. His request for judicial intervention at this stage is therefore at odds with established principles generally requiring prior exhaustion of administrative remedies. See, e.g., United States v. Bisson, 839 F.2d 418, 419-20 (8th Cir.1988), aff'g 646 F.Supp. 701, 706-07 (D.S.D.1986). Moreover, we have carefully considered the circumstances of this case, and we see nothing inherently unfair in holding Madsen accountable for his earlier choice--a choice that also allowed the government reasonably to rely on the uncontested yields in administering its ongoing farm programs.
 
 
 10
 We conclude Madsen's failure to exhaust available administrative remedies prevents belated judicial review of his claims in this case. For this reason, the district court's disposition of Madsen's case is appropriate, and we affirm the court's order dismissing Madsen's complaint.
 
 
 11
 ARNOLD, Circuit Judge, concurring in part and dissenting in part.
 
 
 12
 I agree with the Court that the District Court erred in dismissing Madsen's complaint for lack of jurisdiction. I also agree with the Court's rejection of the government's position, asserted on appeal, that judicial review is unavailable. I disagree, however, with the Court's holding that failure to exhaust administrative remedies bars this action, and I therefore respectfully dissent from the judgment of affirmance. I would reverse and remand this case for further proceedings on the merits, in which Madsen would be given a chance to establish that the crop-yield determinations he seeks to challenge were mistaken.
 
 
 13
 Crop yields established by the ASCS are estimates of farm productivity used in wheat and feed-grain programs as a factor in determining the amount of deficiency and disaster payments to which a farmer is entitled. In 1981 the ASCS, operating through its Pennington County, South Dakota, committee, lowered the wheat yield assigned to Madsen's farm from 26 bushels to 20 bushels per acre. The committee indicated that the reduction was due to Madsen's decision to plant spring wheat rather than the winter wheat crop deemed to be more productive. Later, there was a reduction in wheat yields throughout the county, and Madsen's yield was lowered to 18 bushels per acre. Madsen complained to county committee members about these reductions, but did not appeal the decisions or provide evidence of his actual yield. In response to one of these complaints, the county committee in 1985 gave Madsen a list of five farms in the area. The committee indicated that, in accordance with ASCS rules, Madsen's yield was comparable to that of the listed farms, which assertedly had the same or similar yield capability. Appendix at 1-2. Madsen did not press his complaint further.
 
 
 14
 For the crop years 1982 to 1985, the Agriculture and Food Act of 1981, Sec. 301(d), 7 U.S.C. Sec. 1445b-1(d), provided that the yield for each year "shall be the yield established for the farm for the previous crop year, adjusted by the Secretary to provide a fair and reasonable yield." The statute also required the Secretary to consider actual yields proved by the producer. Id. The Food Security Act of 1985, Sec. 1031, 7 U.S.C. Secs. 1461-69, provided that farm-program yields for wheat crops in 1986 and 1987 were to be determined by taking the prior five yields, excluding the highest and lowest yields, and averaging the remaining three figures. Id. at Sec. 1466(b)(1); see 7 C.F.R. Sec. 713.6(a)(1) (1987). Using this formula, the Pennington County ASCS committee established Madsen's yield at 18 bushels for 1986.
 
 
 15
 Madsen contested his assigned 1986 wheat yield at the county and state levels. He then appealed unsuccessfully to the ASCS Deputy Administrator, State and County Operations. The gist of his challenge was that the county ASCS had arbitrarily given him a low yield and then selected five other farms with low yields as a sham basis for comparison.
 
 
 16
 Although he does not dispute that the ASCS complied fully with the three-year averaging formula provided by 7 U.S.C. Sec. 1466 for crop yields in 1986, Madsen appealed only the 1986 yield to the state ASCS and to the Deputy Administrator. The only basis for his challenge to the 1986 yield is Madsen's assertion that his yields were established improperly in the preceding crop years. Madsen seeks to increase these yields insofar as they affect the calculation of his 1986 yield; however, he did not utilize fully the administrative procedures available at the time the earlier yields were established. The government contends, and Madsen does not deny, that each year Madsen notified the county committee of his dissatisfaction, but did not appeal to the state committee. Madsen contends that proving his actual yield would have been too costly and time-consuming. Madsen's decision to forego completion of administrative remedies in earlier crop years now raises the question whether he should be barred from seeking judicial relief, under the rule requiring exhaustion of administrative remedies.
 
 
 17
 The rule requiring a litigant to exhaust administrative remedies before seeking judicial review of agency action is based on principles of sound judicial administration. See Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463-464, 82 L.Ed. 638 (1938); see also Berger, Exhaustion of Administrative Remedies, 48 Yale L.J. 981, 983 (1938-39) (exhaustion doctrine shaped by the need for orderly procedure and comity, and by equitable principles). Absent a specific statutory requirement, see, e.g., Weinberger v. Salfi, 422 U.S. 749, 765-66, 95 S.Ct. 2457, 2466-67, 45 L.Ed.2d 522 (1975), however, "[e]xhaustion of administrative remedies before going to court is sometimes required and sometimes not," 4 K. Davis, Administrative Law Treatise Sec. 26.1, at 414 (2d ed. 1983). The doctrine is not to be applied "blindly in every case," McKart v. United States, 395 U.S. 185, 200-01, 89 S.Ct. 1657, 1666, 23 L.Ed.2d 194 (1969); rather, a court must consider whether "the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further," West v. Bergland, 611 F.2d 710, 715 (8th Cir.1979), cert. denied, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980).
 
 
 18
 The exhaustion doctrine is normally applied in two very different contexts. See Energy Coop., Inc. v. United States Dep't of Energy, 659 F.2d 146, 149 (Temp.Emer.Ct.App.1981). Application of the doctrine sometimes delays judicial consideration of the claim; in other cases, the exhaustion doctrine may foreclose any judicial review. Application of the doctrine in this case would bar any judicial consideration of Madsen's claim that the ASCS county committee failed to follow proper procedures and acted arbitrarily and capriciously in adjusting his yield. See McGee v. United States, 402 U.S. 479, 491, 91 S.Ct. 1565, 1572, 29 L.Ed.2d 47 (1971) (doctrine barred judicial review of claims of draft registrant who had sidestepped administrative review of his draft classification); United States v. Bisson, 839 F.2d 418, 420 (8th Cir.1988) (in action by government agency to collect debt, debtor was barred from asserting by counterclaim that secured corn was stolen because he failed to exhaust administrative procedures that might have established an offset based on such loss), aff'g 646 F.Supp. 701 (D.S.D.1986).
 
 
 19
 The Supreme Court has acknowledged the "harsh impact" application of the doctrine may have when it operates to bar any judicial review of a litigant's claim. McGee, 402 U.S. at 484, 91 S.Ct. at 1569. In such a case, a court should not dismiss a claim by means of a "mechanical recitation of the broad interests" usually served by exhaustion. Id. at 485, 91 S.Ct. at 1569. The exhaustion decision must reflect a "discrete analysis of the particular default in question, to see whether there is 'a governmental interest compelling enough' to justify the forfeiting of judicial review." Id. (quoting McKart, 395 U.S. at 197, 89 S.Ct. at 1665). I now proceed to such an analysis of the competing interests involved in this case.
 
 
 20
 I first consider the government's interest in requiring exhaustion. McKart and McGee teach that several factors must be weighed, including (1) whether allowing similarly situated litigants to bypass the administrative avenue would seriously impair the agency's ability to perform its function of developing facts and exercising discretion in the first instance; (2) whether allowing judicial review would encourage others to flout the administrative scheme designed by Congress; and (3) whether the circumstances require that the agency be given the first chance to correct its own errors, and to obviate, perhaps, the need for judicial review. McGee, 402 U.S. at 484, 91 S.Ct. at 1569 (citing McKart, 395 U.S. at 194-95, 89 S.Ct. at 1662-63).
 
 
 21
 The ASCS county committee established Madsen's yield in the first place; thus, the agency, at least on the local level, has had an opportunity to apply its expertise to the circumstances of this case. Permitting judicial review of this agency decision would not seriously undermine the agency function, because 7 U.S.C. Sec. 1385 limits the courts to the narrow question of whether the ASCS violated its own procedures for establishing yields, or assigned yields to Madsen in an arbitrary or capricious fashion. Moreover, I do not believe others would be encouraged to flout administrative processes by a decision excusing failure to exhaust in this case, because Madsen and others like him had already made decisions about appealing wheat yields before the Food Security Act of 1985 altered the consequence of those decisions. It is unlikely that a similar unusual situation--involving a change in the law giving an unexpected adverse effect to a past event--will happen again.
 
 
 22
 I must also examine Madsen's interests. His contentions are not patently meritless. Madsen contends that the ASCS county committee told him it had set his yield based on comparisons with other farms having the same or similar yield capability. Madsen says, however, that this was a sham, that the farms purportedly used for this comparison were the only farms in the county with 18-bushel yields, and that these farms all had acreage bases of less than 200 acres, while Madsen's acreage base was more than 1,000 acres. I think Madsen's interest in determining whether the procedure used complied with agency regulations is considerable.
 
 
 23
 Moreover, the fairness of requiring exhaustion under the particular circumstances of a case is a proper consideration. See Bowen v. City of New York, 476 U.S. 467, 482, 106 S.Ct. 2022, 2031, 90 L.Ed.2d 462 (1986) (in the interest of fairness, Court would not require complete exhaustion of appeals process by Social Security claimants who were not aware of agency's improper internal policy when claims were first rejected). In making an exhaustion decision this Court has previously considered the effect of a change in circumstances that rendered relief through administrative channels highly improbable. See Arkla Exploration Co. v. Texas Oil & Gas Corp., 734 F.2d 347, 355 (8th Cir.1984) (exhaustion doctrine would not be applied to state when at the time state had standing to challenge leases Secretary of Interior had invalidated them, but later Court of Appeals decision ordering Secretary to reinstate leases made it unlikely state could ever get relief in administrative proceeding), cert. denied, 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985).
 
 
 24
 When Madsen decided not to appeal the wheat yields set by the county committee from 1981 to 1985, he was faced with a certain set of facts, including the consequences that would flow from a failure to appeal. At that time, the price for such a failure was one year of the lowered yield. Subsequently, Congress greatly increased the adverse consequences of failing to undo the county committee's decision, in a way no one could have foreseen: the annual yields from 1981 to 1985 now have prospective impact. It seems to me unfair to bar Madsen from even the limited review permitted by Section 1385. I think he has demonstrated good reason for not fully availing himself of administrative remedies. Cf. Bisson, 839 F.2d at 420 (no good reason shown for failure to use all available avenues of administrative redress).
 
 
 25
 In reaching this conclusion I am mindful that Madsen's challenge to his previous wheat yields focuses on these figures as relevant data in the calculation of his 1986 yield. Madsen's situation is thus analogous to that recognized as an exception to general rules of issue preclusion. See Restatement (Second) of Judgments Sec. 28(5) (1982). Rules of preclusion do not apply when there is a convincing need for a new determination because it was not sufficiently foreseeable that the issue would arise in a subsequent action or because the party sought to be precluded did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action. Id. I think the principles underlying this exception to issue preclusion apply with similar strength to the exhaustion doctrine in this context. The new statute has increased the stakes for Madsen, giving him a greater incentive to seek review than he had in the previous years.
 
 
 26
 Under all of the circumstances of this case, I cannot agree that the doctrine of exhaustion of administrative remedies should be applied to deprive Madsen of the narrow review that would otherwise be available.